UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MONA CONWAY, Individually and on behalf of
her son K.C.G., a child with a disability and
those similarly situated,

                     Plaintiffs,

        - against-

BOARD OF EDUCATION OF NORTHPORT-
EAST NORTHPORT SCHOOL DISTRICT,
MARYLOU MCDERMOTT, in her individual
and official capacity as Superintendent of Schools,
CHRISTINA PULASKI, in her individual and
official capacity as Director of Special Education,
IRENE McLAUGHLIN, in her individual and
official capacity as Principal of NORTHPORT
HIGH SCHOOL, DENISE KEENAN, in her
individual and official capacity as Vice-Principal,
TERRENCE HINSON, in his individual and
official capacity as Chairperson of Guidance, and
REGINA THOMAS, in her individual and official
capacity as Guidance Counselor,

                     Defendants.

-------------------------------------------------------------X

**OPINION AND ORDER**
**13-CV-5283 (SJF)(WDW)**

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   AUG 0 1 2014   ★

**LONG ISLAND OFFICE**

FEUERSTEIN, J.

On September 23, 2013, *pro se* plaintiff Mona Conway ("plaintiff") commenced this

action[1] on behalf of herself and her son, K.C.G.[2], a child with a disability, against defendant

Board of Education of Northport-East Northport School District ("the Board of Education" or

"the School District") and defendants Marylou McDermott ("McDermott"), in her individual and

---

    [1] Although plaintiff claims to bring this action on behalf of "those similarly situated," she
never moved for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

    [2] Although appearing *pro se* in this action, plaintiff is an attorney licensed to practice in
the State of New York and, therefore, can maintain this action on behalf of her son.



official capacity as Superintendent of Schools; Christina Pulaski ("Pulaski"), in her individual and official capacity as Director of Special Education; Irene McLaughlin ("McLaughlin"), in her individual and official capacity as Principal of Northport High School ("Northport H.S." or "the School"); Denise Keenan ("Keenan"), in her individual and official capacity as Vice-Principal of Northport H.S.; Terrence Hinson ("Hinson"), in his individual and official capacity as Chairperson of Guidance; and Regina Thomas ("Thomas"), in her individual and official capacity as Guidance Counselor (collectively, "the individual defendants"), alleging violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*; the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. § 794; and the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"). The School District and individual defendants (collectively, "defendants") now move to dismiss the complaint pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and failure to state a claim for relief. For the reasons set forth below, the motion is denied.

I.      Background

        A.      Factual Background[3]

        At the time this action was commenced, K.C.G. was seventeen (17) years old. (Complaint ["Compl."], ¶ 4).

        On or about August 7, 2012, plaintiff appeared at Northport H.S. to register K.C.G. "as an incoming Junior (eleventh grade)," (Compl., ¶ 16), as her family "had just moved into the school

_____

[3] The following facts are taken from the complaint and are assumed to be true for purposes of this motion. They do not constitute findings of fact by the Court.

2

district," (Compl., ¶ 4). At that time, plaintiff: (1) submitted "all pertinent and otherwise required paperwork * * * to the admissions department at Northport H.S.; such paperwork included retrieved documentation from [K.C.G.'s] previous high school, Huntington High School, and medical information[,]" (Compl., ¶ 17); (2) notified "attendance personnel" (a) that [K.C.G.] was having medical problems, causing him to have to attend his last months at Huntington High School on 'home instruction[,]'" (Compl., ¶ 18), and (b) that K.C.G. "was being treated by physicians for chronic stomach pains, migraine headaches, insomnia, anxiety and depression," (Compl., ¶ 19); and (3) requested "that a conference with a guidance counselor be scheduled as soon as possible to ensure that an evaluation and suitable accommodations be put in place before the start of the school year." (Id.)

On or about August 14, 2012, K.C.G. had a physical examination by his treating physician, who completed the School District's "standard physical examination form," (Compl., ¶ 20), indicating that K.C.G. was being treated for "stomach pains, headaches, anxiety, depression, ADD [attention deficit disorder]," (Compl. ¶ 21), and submitted it to Northport H.S., (Compl., ¶ 20).

On or about August 15, 2012, plaintiff met with Hinson "to discuss [K.C.G.'s] disabilities and further discuss Northport H.S.'s available accommodations[,]" (Compl., ¶ 22), at which time Hinson "assured" her that Northport H.S. would make "appropriate accommodations" for K.C.G. (Id.) According to plaintiff, although Hinson scheduled a "follow-up meeting * * * to speak with [K.C.G.], introduce him to the school with a tour of the building and further discuss [K.C.G.'s] medical issues so that an accommodation could be put in place for [K.C.G.][,]" (Compl., ¶ 23), he subsequently cancelled that meeting and never rescheduled it. (Compl., ¶ 24). "Instead,

[K.C.G.] was referred to Regina Thomas * * * to discuss accommodations for [him] and an appointment was scheduled to take place before the start of the school year." (Compl., ¶ 25).

According to plaintiff, Thomas twice rescheduled the meeting, ultimately rescheduling it on September 5, 2012, the first day of school. (Compl., ¶ 26). On September 5, 2012, plaintiff and K.C.G. met with Thomas. (Compl., ¶ 27). After plaintiff "raised the issue of [K.C.G's] disability," Steven Bouchet ("Bouchet"), whom plaintiff believes to be the School's social worker, "was called to Ms. Thomas's office to assist." (Compl., ¶ 27, 29). According to plaintiff, "[a] brief and harried discussion took place between [her]self, Mr. Bouchet, Ms. Thomas and [K.C.G.], as Ms. Thomas rushed to attend to several different tasks[,] * * * apologized profusely for the delays, lack of information and stressful beginning of the school year for [K.C.G.] and promised to schedule a focused meeting to address [K.C.G.'s] disabilities." (Compl., ¶¶ 30-31).

On or about September 12, 2012, K.C.G. "lost consciousness as a result of a panic attack and collapsed into a bakery shelf display," following which he was taken by ambulance to Huntington Hospital where he "received multiple stitches across his nose and eyelid." (Compl., ¶ 32). After the "guidance office" at Northport H.S. was notified of that incident, "[a]n impromptu decision was made by [it] to place [K.C.G.] on 'home instruction' as a temporary measure until an evaluation by the School's psychiatrist could be conducted." (Compl., ¶ 34).

"Approximately four (4) weeks later, [K.C.G.] was provided with a list of five (5) home instructors, along with a schedule to meet such instructors at the local library, which is approximately one-and-a-half miles from [his] residence." (Compl., ¶ 35). According to plaintiff, she "was required to take time from work each day to drive [K.C.G.] to and from the

4

library for 'home instruction[,]'" (Compl., ¶ 36), in the subjects of algebra, U.S. history, forensic science, English and "Living Environment." (Compl., ¶ 37). K.C.G. "was not offered any electives for home instruction, nor was he given any home instruction for physical education." (Compl., ¶ 38). Thus, according to plaintiff, "remaining on home instruction throughout the entire school year would necessarily deprive [K.C.G.] of an opportunity to meet the requisite credit number to enable him to graduate on time." (Id.)

According to plaintiff, K.C.G. "attended home instruction as consistently as he could, given his chronic illness and was, to [her] knowledge, performing well and at grade level." (Compl., ¶ 39). "The limited reports [plaintiff] received with respect to [K.C.G.'s] progress were almost always verbal and only after [she] inquired regarding same from each of his instructors." (Compl., ¶ 40).

Plaintiff alleges that "[f]rom September through December, [she] made periodic telephone calls to Steven Bouchet and the guidance office to follow-up on the status of [K.C.G.'s] evaluation[,]" (Compl., ¶ 41), but it was not until "[s]ometime in November of 2012" that Northport H.S. contacted her to advise her that K.C.G. "was assigned to a psychiatrist for an evaluation." (Compl., ¶ 42). That evaluation did not occur because the psychiatrist subsequently left Northport H.S. (Compl., ¶ 43).

"On or about December 6, 2012, Mr. Bouchet contacted [plaintiff] to inform [her] that all of [K.C.G.'s] records - including medical records from his treating physician and previous school - had been requested by superior school personnel and suggested that some form of accommodation would be designed for [K.C.G.] with respect to his disability." (Compl., ¶ 44).

On or about December 11, 2012, K.C.G. and his parents attended a meeting at Northport

5



H.S. with Bouchet, Thomas "and, for a brief period, a person introduced as psychologist, Dr. Digose," to discuss K.C.G.'s disability, (Compl., ¶¶ 45-46), during which they "were informed that the school would be working on an evaluation plan and further discussion regarding an appropriate of [sic] instruction would be forthcoming." (Compl., ¶ 47). According to plaintiff, "[o]ver the next several weeks, [she] made periodic telephone calls to Steven Bouchet and the guidance office to follow-up on the status of [K.C.G.'s] pending evaluation." (Compl., ¶ 48).

On or about January 18, 2013, Bouchet contacted plaintiff, advised her that "he had spoken with the Chairperson of Special Education and that the School was still working on [K.C.G.'s] case[,]" apologized for the delays and indicated that the delays "were due to staff illnesses." (Compl., ¶ 49).

On or about February 4, 2013, Thomas cancelled "an annual 'Junior Conference'" with K.C.G. that she had scheduled for February 6, 2013 " to discuss course planning for the following year and * * * college offerings and planning," (Compl., ¶ 50), because "she believed that such a meeting was not appropriate for [K.C.G.]." (Compl., ¶ 51).

Plaintiff alleges that in February and March of 2013, Dr. Digose; Rosanne Grasso, Dr. Digose's "replacement;" and Dr. Michael Comiskey, Grasso's "replacement," all contacted her "to inform [her] that an evaluation of [K.C.G.'s] disability would be forthcoming." (Compl., ¶ 52). According to plaintiff, Northport H.S. cancelled: (a) her appointment to meet with Dr. Digose on March 11, 2013; (b) a psychological evaluation scheduled for March 22, 2013; and (c) a meeting with school personnel scheduled for April 19, 2013. (Compl., ¶¶ 53, 55-56). Northport H.S. conducted an educational evaluation of K.C.G. on March 20, 2013. (Compl., ¶ 54). However, according to plaintiff, the educational evaluation: (a) "was inappropriate, as it



tested for learning disabilities, which was never a concern with respect to [K.C.G.][,] [who] has a high I.Q. with no apparent learning disabilities," (Compl., ¶ 54); (b) was done "simply [to] placate[] [her] continuous pleas for assistance from the School," (id.); and (c) "delayed the process of helping [K.C.G.]." (Id.)

On or about March 27, 2013, plaintiff was sent "a written notification of a Meeting of the Committee on Special Education (CSE) * * * scheduled for April 19, 2013 at 1:45 p.m." ("the CSE meeting"). (Compl., ¶ 57).

Dr. Comiskey conducted a psychological evaluation of K.C.G. on April 3, 2013 and produced a seven (7)-page report of his findings on April 15, 2013. (Compl., ¶ 58). According to plaintiff, Dr. Comiskey found that K.C.G. "had no indication of learning disabilities" and "presented 'a high average Full-Scale IQ[,]'" (Compl., ¶ 59), and recommended that "the current level of impact [K.C.G.'s] behavior, emotions, and reported medical concerns has had on his education be considered when discussing intervention through Special Education[,]'" (Compl., ¶ 60).

On April 18, 2013, plaintiff met with Dr. Comiskey in his office at Northport H.S., at which time she "explained to him that Northport H.S. had taken so much time to schedule an evaluation of [K.C.G.] that he had been on home instruction for most of the school year[,] * * * expressed the inappropriateness of th[o]se measures and implored him to do what he could to expedite the process on [K.C.G.'s] behalf." (Compl., ¶ 61). According to plaintiff, "Dr. Comiskey appeared to be very understanding and promised to do his best, working in conjunction with Mr. Bouchet, to get [K.C.G.] properly evaluated and devise an appropriate educational schedule for him." (Id.)

7



On April 19, 2013, the CSE meeting, attended by plaintiff, CSE chairperson Ally Giaimo ("Giaimo"), Keenan, "Special Education Teacher, Meredith Kule and a substitute for Dr. Michael Comiskey named 'Dr. White'", (Compl., ¶ 63), began late. (Compl., ¶ 62). In addition to those appearing in person at the conference, Thomas and K.C.G.'s home instructor for U.S. History, Jennifer Cain ("Cain"), "partially participated by telephone." (Compl., ¶¶ 63-64). During the meeting, Cain indicated "for the first time" that K.C.G. "was 'missing' 90% of his work." (Compl., ¶ 64). However, according to plaintiff, "within two (2) weeks prior to th[e] [CSE] meeting," she had asked Cain how K.C.G. was doing during a home instruction session in her home and Cain "only expressed how impressed she was with [K.C.G.'s] knowledge of the Civil War and related materials that were currently being studied." (Id.)

Plaintiff alleges that "[d]uring the CSE Meeting, the Committee Chair verbally denied any assistance to [K.C.G.], based on the findings of the participants of the Committee." (Compl., ¶ 65). According to plaintiff, after she "insisted that the Committee reevaluate its decision, stating that [K.C.G.] had been out of school for nearly eight (8) months because the School had allowed [him] to languish on home instruction without any special assistance and that [he] was poised to drop out of high school as a result of this lack of care and attention to his education[,] * * * the Committee changed its initial determination of denial of services." (Compl., ¶¶ 66-67). "The Committee's report, dated April 19, 2013, stated that it 'could not determine if [K.G.C.] is eligible to receive special educational services[]' * * * [and] recommended a 'psychiatric evaluation.'" (Compl., ¶¶ 68-69).

On April 30, 2013, plaintiff and K.C.G. met with Bouchet at Northport H.S. "to, once again, discuss the School's plans to assist [K.C.G.]." (Compl., ¶¶ 70-71). According to plaintiff,

8



"Mr. Bouchet spent the first half-hour of this 'meeting' inquiring as to [K.C.G.'s] health and well-being and his home instruction. He then gave us a tour of the 'time-out room' of the School. It is a dank room with little-to-no learning materials and no educators present. The 'time-out room' is where children are sent as a disciplinary measure. The reason stated for bringing us to this place was to persuade [K.C.G.] to spend, what Mr. Bouchet estimated was the last 26 school days in this room to finish out his Junior year."

(Compl., ¶ 72). When Keenan eventually joined the meeting, she and Bouchet "began discussing the importance of having [K.C.G.] coming back to school," (Compl., ¶¶ 74-75), and "spoke about the same issues that had been previously discussed at length again for the next hour or so." (Compl., ¶ 76). According to plaintiff, approximately two (2) hours after she and K.C.G. had arrived for the meeting, Thomas "participated in the meeting by bringing [K.C.G.'s] academic records, which [they] reviewed as a group." (Compl., ¶ 77). At that time, K.C.G. and plaintiff "were first alerted to the fact that art and physical education courses were indicated on his course schedule." (Compl., ¶ 78). According to plaintiff, Keenan did not respond when she asked her "why [K.C.G.] was not provided with materials to complete th[at] coursework * * *." (Id.) In addition, plaintiff alleges that she "was also told for the first time, that [K.C.G.] had received only 1.5 credits from his previous high school[,] * * * [which] contradicted the information [1] that [K.C.G.] and [plaintiff] were given on his first day of school at Northport H.S., when Ms. Thomas indicated that she would set up a schedule for [K.C.G.] to enable him to graduate on time[;] * * * [and] [2] [that she] received at a later meeting with another vice-principal of the School, when [she] was told that [K.C.G.] had 6.75 credits from his previous high school." (Compl., ¶ 80). According to plaintiff, she "strongly objected" to Keenan's and Thomas's suggestion that K.C.G. return to school and begin to attend classes "[g]iven [K.C.G.'s] medical

9

condition, and the fact that introducing him to new students, new teachers and new materials with less than four (4) weeks of school days remaining would likely disrupt the progress he had made academically to that point[.]" (Compl., ¶ 81). Plaintiff alleges that "Mr. Bouchet agreed that such a transition would not help [K.C.G.] and would likely be educationally and psychologically damaging." (Id.)

"After carefully reviewing [K.C.G.'s] transcripts, it was revealed that the only way [he] could graduate on time would be for him to take two (2) years of summer school[] [and] [that] [e]ven if [he] passed all of his current course work and did well on the Regents Exams, he was destined to be a 'super Senior,' meaning that he could only graduate after his second year of summer school in August of 2014." (Compl., ¶ 82). "After much discussion on the matter, [K.C.G.] agreed to follow Northport H.S.'s Senior schedule for him, including two full summer school sessions, so long as he could remain on home instruction for the remainder of the school year and not be forced to attend classes, as originally proposed by Ms. Keenan." (Compl., ¶ 83). According to plaintiff, Keenan "agreed to allow [K.C.G.] to complete his course work *via* home instruction until the end of the school year[] * * * [and] then said, 'We'll need another doctor's note right away.'" (Compl., ¶ 84). Plaintiff "proceeded to immediately arrange another appointment with [K.C.G.'s] doctor[,]" which was scheduled for the following week. (Compl., ¶ 85).

On May 2, 2013, plaintiff "received a telephone call from Steve Bouchet to inform [her] that [K.C.G.'s] home instruction was immediately terminated[] [and that] [K.C.G.] was directed to attend his classes in school immediately." (Compl., ¶ 86).

On May 20, 2013, plaintiff "was contacted by Northport personnel to inform [her] that

10

[K.C.G.'s] home instruction was being reinstated." (Compl., ¶ 89). However, according to plaintiff, "at that time, only two (2) of the five (5) instructors were currently available to [K.C.G.]." (Compl., ¶ 90). Around the same time, plaintiff "received a letter stating that a psychiatric evaluation would take place on June 17, 2013 with Dr. Edelman." (Compl., ¶ 91).

On May 22, 2013, plaintiff wrote to Keenan "implor[ing] her to contact her immediately to remedy the incomprehensible sabotaging of [K.C.G.'s] education[] * * * [and] referenc[ing] the Regents Exams and how [K.C.G.] might be prepared for them." (Compl., ¶ 92). Plaintiff copied McLaughlin, Bouchet and Dr. Comiskey on that correspondence, (id.), but received no response from any of its recipients. (Compl., ¶ 93).

According to plaintiff, "Eleventh grade Regents exams were held on June 10 through 13, 2013[] [and] [she] received several telephone messages from someone from 'the Alternative Program,' stating that the exams were underway each day." (Compl., ¶ 94).

On June 17, 2013, plaintiff received a message from someone at Northport H.S. "[a]sking that [K.C.G.] clean out his locker and stating that a plastic bag was found in it." (Compl., ¶ 95). According to plaintiff, K.C.G. did not have a locker at the School. (Id.) On that same date, plaintiff: (1) sent a follow-up letter to Keenan, on which she copied McLaughlin, Bouchet and Dr. Comiskey, "requesting that the issues raised in [her] May 22nd [letter] be addressed[,]" (Compl., ¶ 96); and (2) sent a letter to McDermott enclosing copies of both her May 22nd and June 17th letters to Keenan and requesting that McDermott contact her because "the issues involved are extremely serious." (Compl., ¶ 98). According to plaintiff, neither Keenan nor McDermott responded to those letters. (Compl., ¶¶ 97-98).

On June 21, 2013, at approximately 2:00 p.m., Thomas called plaintiff to ask her if

K.C.G. would be attending summer school. (Compl., ¶ 99). When plaintiff asked Thomas if she read or knew about her "correspondence to the School regarding [K.C.G.'s] academic situation[,] [Thomas] denied knowing anything about it * * *." (Id.) At approximately 2:30 p.m. on that same date, plaintiff received a telephone call from Pat Lynch ("Lynch") "stating that she was calling to set up an appointment with [her] to meet with Principal McLaughlin." (Compl., ¶ 100). According to plaintiff, a meeting "to include only [her]self and Ms. McLaughlin for the express purpose of addressing the issues raised in [her] letters to Ms. Keenan[,]" was scheduled for June 27, 2013 at 10:00 a.m. (Compl., ¶ 101).

On June 27, 2013, at approximately 9:00 a.m., Shannon Dantuono, Northport H.S.'s Vice-Principal, called plaintiff to advise her that McLaughlin was unavailable for the meeting and offered to meet with plaintiff, in the presence of Keenan and Dr. Comiskey, "in order to specifically discuss the contents of [her] May 22, 2013 letter to Denise Keenan." (Compl., ¶ 103). According to plaintiff, "[d]uring th[e] hour-long meeting, nothing was accomplished; more time had been wasted[;] * * * further aggravation was added to the already highly frustrated state of affairs with respect to [K.C.G.'s] High School education[;] * * * [plaintiff] received no apologies * * * [and] was offered preposterous 'solutions' to remedy [K.C.G.'s] academic situation (including a 'program' for suspended children); [K.C.G.'s] disabilities were continually ignored; and, ultimately, [her] parental concerns were met with blatant hostility." (Compl., ¶¶ 105-106).

On June 28, 2013, plaintiff sent a letter to McLaughlin, on which she copied McDermott, "detailing the [June 27, 2013] meeting * * *[;] summariz[ing] the debacle of [K.C.G.'s] educational experiences at Northport H.S. * * * [and] demand[ing] [K.C.G.'s] complete file and

12

* * * information that the School and the District are mandated to provide by law for parents to dispute the educational plans of students." (Compl., ¶ 107). According to plaintiff, she "received no response to [her] letter and no information regarding procedural safeguards for parents." (Compl., ¶ 108).

On August 15, 2013, Lynch called plaintiff and told her that K.C.G.'s file "would be available to pick up on August 19, 2013." (Compl., ¶ 109). Plaintiff alleges that she "picked up the file prepared for [her], which primarily contains a haphazard collection of academic records, a few notes and emails, and reports of [K.C.G.'s] progress from his home instructors, which had not been previously forwarded to [her]." (Compl., ¶ 110).

Plaintiff also alleges that she "frequently received automated telephone messages throughout the year, stating that [K.C.G.] had missed certain class periods[,] * * * [which] were inappropriate since [K.C.G.] was not an in-school student attendee." (Compl., ¶ 111).


B.    Procedural Background

On September 23, 2013, plaintiff commenced this action against defendants alleging violations of the IDEA, the Rehabilitation Act and Section 1983. Specifically, plaintiff alleges, *inter alia*: (1) that defendants "have violated [Section 1415] of the IDEA by failing to provide special education and related services, tailored to meet [K.C.G.'s] unique needs[;] * * * failing to provide services to [K.C.G.] that are reasonably calculated to enable [him] to receive the educational benefits he is entitled to under State and Federal law[;] * * * [and] knowingly refus[ing] to provide [K.C.G.] with an Individualized Education Plan (IEP)" (first cause of action) (Compl., ¶¶ 115-116, 119, 134); (2) that the Board of Education, the School District and

13

Northport H.S. violated the Rehabilitation Act "by failing to appropriately accommodate [K.C.G.'s] disability;" "by discriminating against [K.C.G.] due to his disability;" and by "knowingly refus[ing] to provide [K.C.G.] with an educational plan" (second cause of action), (Compl., ¶¶ 142, 147, 149); and (3) that defendants violated Section 1983 by "directly and proximately caus[ing] the deprivation of [K.C.G.'s] constitutional rights by systematically depriving him and [plaintiff] of their rights under the IDEA and by discriminating against [K.C.G.] under the Rehabilitation Act" (third cause of action), (Compl., ¶ 159). Plaintiff seeks, *inter alia*, compensatory and punitive damages; an injunction "preventing Defendants from continuing to engage in the wrongful and illegal conduct as described [in the complaint][;]" and costs and attorney's fees. (Compl. at 25).

Defendants now move to dismiss the complaint pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and failure to state a claim for relief.

II.    Discussion

    A.    Rule 12(b)(1)

        1.    Standard of Review

"Federal courts are courts of limited jurisdiction," Gunn v. Minton, — U.S. —, 133 S. Ct. 1059, 1064, 185 L. Ed. 2d 72 (2013) (quoting Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)); see also Mims v. Arrow Financial Services, LLC, — U.S. —, 132 S. Ct. 740, 747, 181 L. Ed. 2d 881 (2012), and may not preside over cases absent subject matter jurisdiction. See Exxon Mobil Corp. v. Allapattah

14

Services, Inc., 545 U.S. 546, 552, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005) (holding that federal courts may not exercise jurisdiction absent a statutory basis); Kokkonen, 511 U.S. at 377, 114 S. Ct. 1673 (holding that federal courts "possess only that power authorized by Constitution and statute * * *.") Lack of subject matter jurisdiction cannot be waived or forfeited and may be raised at any time by a party or by the court *sua sponte*. See Gonzalez v. Thaler, — U.S. —, 132 S. Ct. 641, 648, 181 L. Ed. 2d 619 (2012); see also Sebelius v. Auburn Regional Medical Center, — U.S. —, 133 S. Ct. 817, 824, 184 L. Ed. 2d 627 (2013) ("Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy."); Henderson ex rel. Henderson v. Shinseki, — U.S. —, 131 S. Ct. 1197, 1202, 179 L. Ed. 2d 159 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press. * * * Objections to subject-matter jurisdiction * * * may be raised at any time.") If a court lacks subject matter jurisdiction, it must dismiss the action. See Fed. R. Civ. P. 12(h)(3); Arbaugh v. Y & H Corp., 546 U.S. 500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006); Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62-3 (2d Cir. 2009).

"[M]aterials extrinsic to the complaint" may be considered on a Rule 12(b)(1) motion. Moser v. Pollin, 294 F.3d 335, 339 (2d Cir. 2002); see also Phifer v. City of New York, 289 F.3d 49, 55 (2d Cir. 2002).

### 2. IDEA Claim

"The IDEA's central mandate is to provide disabled students with a 'free appropriate

public education' in the least restrictive environment suitable for their needs." Cave v. East Meadow Union Free School District, 514 F.3d 240, 245 (2d Cir. 2008); see also Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 481-82 (2d Cir. 2002) ("The IDEA * * * mandates federal grants to states to provide disabled children with 'a free appropriate public education' in the least restrictive appropriate environment.") "Under the educational scheme of the IDEA * * *, parents of students with disabling conditions are guaranteed 'both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate.'" Cave, 514 F.3d at 245 (quoting Honig v. Doe, 484 U.S. 305, 311-12, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988)). "Educators and parents of a child covered by the IDEA must jointly develop an 'individualized education program' ('IEP') for each year of the child's education." Polera, 288 F.3d at 482. "The IEP is the central mechanism by which public schools ensure that their disabled students receive a free appropriate public education." Id.

"The IDEA requires that states offer parents of a disabled student an array of procedural safeguards designed to help ensure the education of their child[.]" Polera, 288 F.3d at 482 (citing 20 U.S.C. § 1415(a)[4]). "If a parent believes that her child's IEP or the school's implementation of the IEP does not comply with the IDEA, the parent may file a 'due process complaint' with the appropriate state agency." B.M. v. New York City Department of Education, — F. App'x —, 2014 WL 2748756, at * 1 (2d Cir. June 18, 2014) (summary order) (citing 20 U.S.C. §

_____

[4] Section 1415(a) provides: "Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."

16

1415(b)(6)[5]); see also Cave, 514 F.3d at 245 ("Parents are * * * entitled to request a due process hearing in order to present complaints as 'to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education.'" (quoting 20 U.S.C. § 1415(b)(6)(A))); 20 U.S.C. § 1415(f)(1)(A) ("Whenever a complaint has been received under subsection (b)(6) * * *, the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency."); N.Y. Educ. Law § 4404(1)(a) ("If the parent * * * of a student * * * presents a complaint with respect to any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student * * *, and the party presenting the complaint or their attorney provides a due process complaint notice in accordance with federal law and regulations and such complaint sets forth an alleged violation that occurred not more than two years before the date the parent * * * knew or should have known about the alleged action that forms the basis for the complaint, the board or agency shall appoint an impartial hearing officer to review the due process complaint notice when challenged and, if the matter is not resolved in a resolution session that has been convened as required by federal law, to preside over an impartial due process hearing

---

[5] Section 1415(b) provides, in relevant part: "The procedures required by this section shall include the following: * * * (6) An opportunity for any party to present a complaint– (A) with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child; and (B) which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint under this subchapter, in such time as the State law allows, except that the exceptions to the timeline described in subsection (f)(3)(D) shall apply to the timeline described in this subparagraph."

17

and make a determination within such period of time as the commissioner by regulation shall determine * * *.) "Districts are then permitted a thirty-day 'resolution period' to address alleged deficiencies without penalty." B.M., 2014 WL 2748756, at * 1 (citing 20 U.S.C. § 1415(f)(1)(B)[6]). "Once the resolution period has run, a parent may continue to a due process hearing before an independent hearing officer ('IHO') and appeal the resulting decision to a state review officer ('SRO')." Id. (citing 20 U.S.C. § 1415(f)[7]; N.Y. Educ. Law § 4404(2)[8]); see also

---

[6] Section 1415(f)(1)(B)(i) provides, in relevant part: "Prior to the opportunity for an impartial due process hearing under subparagraph (A), the local educational agency shall convene a meeting with the parents and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint– (I) within 15 days of receiving notice of the parents' complaint; (II) which shall include a representative of the agency who has decisionmaking authority on behalf of such agency; * * * and (IV) where the parents of the child discuss their complaint, and the facts that form the basis of the complaint, and the local educational agency is provided the opportunity to resolve the complaint, unless the parents and the local educational agency agree in writing to waive such meeting, or agree to use the mediation process described in subsection (e)."

Section 1415(f)(1)(B)(ii) provides: "If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all of the applicable timelines for a due process hearing under this subchapter shall commence."

[7] Section 1415(f)(3)(C) provides: "A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows."

Section 1415(f)(3)(D) provides, in relevant part: "The timeline described in suparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to– * * * (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent."

[8] Section 4404(2) provides, in relevant part: "A state review officer of the education department shall review and may modify, in such cases and to the extent that the review officer deems necessary, in order to properly effectuate the purposes of this article, any determination of the impartial hearing officer relating to the determination of the nature of a child's handicapping

20 U.S.C. §§ 1415(g)(1) ("If the hearing required by subsection (f) is conducted by a local educational agency, any party aggrieved by the findings and decision rendered in such hearing may appeal such findings and decision to the State educational agency.") and (g)(2) ("The State educational agency shall conduct an impartial review of the findings and decision appealed under paragraph (1). The officer conducting such review shall make an independent decision upon completion of such review.") "Only after exhaustion of th[e] procedures [set forth in Section 1415 of the IDEA] has an aggrieved party the right to file a suit in a federal or state court." Cave, 514 F.3d at 245 (citing 20 U.S.C. § 1415(i)(2)(A)[9]); see also Coleman v. Newburgh Enlarged City Sch. Dist., 503 F.3d 198, 204-05 (2d Cir. 2007) ("It is well settled that the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court. . . ." (quoting J.S. v. Attica Cent. Sch., 386 F.3d 107, 112 (2d Cir. 2004))).

The Second Circuit has held that "[f]ailure to exhaust the administrative remedies [set forth in the IDEA] deprives the court of subject matter jurisdiction." Cave, 514 F.3d at 245; see also Baldessarre ex rel. Baldessarre v. Monroe-Woodbury Cent. Sch. Dist., 496 F. App'x 131, 133 (2d Cir. Sept. 14, 2012) (summary order); Polera, 288 F.3d at 483[10] "The purpose of the

------

condition, selection of an appropriate special education program or service and the failure to provide such program and require such board to comply with the provisions of such modification. * * *"

[9] Section 1415(i)(2)(A) provides, in relevant part: "* * * [A]ny party aggrieved by the findings and decisions made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought * * * in a district court of the United States, without regard to the amount in controversy."

[10] Although "the Second Circuit, in dicta, has called into question its precedents finding the IDEA's exhaustion requirement to be jurisdictional * * * binding Second Circuit decisions * * * continue to hold * * * that a plaintiff's unexcused failure to exhaust the administrative remedies set forth in the IDEA divests the district court of jurisdiction." M.H. ex rel. K.H. v.

exhaustion rule is to 'channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances.'" Cave, 514 F.3d at 245-46 (quoting Polera, 288 F.3d at 487); see also J.S., 386 F.3d at 112 ("Exhaustion of administrative remedies is required under the IDEA so that disputes related to the education of disabled children are first analyzed by administrators with expertise in the area who can promptly resolve grievances."); Taylor v. Vermont Department of Education, 313 F.3d 768, 790 (2d Cir. 2002) ("[T]he IDEA's administrative remedies scheme is * * * critical because it allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children." (quotations and citation omitted)).

It is undisputed that plaintiff did not exhaust the IDEA's administrative remedies.

---

Mount Vernon City Sch. Dist., No. 13-cv-3596, 2014 WL 901578, at * 5 n. 4 (S.D.N.Y. Mar. 3, 2014) (citing Cave, 514 F.3d at 245). In any event, even if no longer considered to be jurisdictional, defendants have challenged plaintiff's failure to exhaust "from [their] first opportunity, mooting the determination whether the exhaustion requirement is jurisdictional or operates as an affirmative * * * defense." B.M., 2014 WL 2748756, at * 1; see also Coleman, 503 F.3d at 204 ("[W]e are not forced to decide whether our precedent, which labels the IDEA's exhaustion requirement as a rule affecting subject matter jurisdiction rather than an 'inflexible claim-processing' rule that may be waived or forfeited, remains good law after [certain Supreme Court decisions] because there can be no claim of waiver or forfeiture here[]. Defendants have consistently challenged the district court's exhaustion ruling throughout this litigation.") "Whether or nor the exhaustion requirement is jurisdictional, exhaustion of administrative remedies is a prerequisite to a civil suit unless the plaintiff can allege that an exception should apply." Levine v. Greece Cent. Sch. Dist., 353 F. App'x 461, 463 (2d Cir. Nov. 12, 2009) (summary order). Moreover, even if "merely an affirmative defense," id., where "the complaint on its face shows that there is no possibility that it could be amended to allege facts that, if true, would demonstrate that the plaintiff satisfied the exhaustion requirement, failure to exhaust is a proper ground for a motion to dismiss." Id.

"[C]omplainants must overcome th[e] * * * [exhaustion] hurdle not only when they wish to file a suit under the IDEA itself, but also whenever they assert claims for relief *available* under the IDEA, regardless of the statutory basis of their complaint." Cave, 514 F.3d at 246 (emphasis in original); see also 20 U.S.C. § 1415(*l*) ("Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, * * *, title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791, *et seq.*], or other Federal laws protecting the rights of children with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter*." (emphasis added)); J.S., 386 F.3d at 112 ("The [IDEA's] exhaustion requirement also applies where plaintiffs seek relief under other federal statutes when relief is also available under the IDEA.") "The language of Section 1415(*l*) of the IDEA is sufficiently broad and encompasses complaints asserted under *any* federal statute, as long as they seek relief available under the IDEA[,]" Cave, 514 F.3d at 248 (emphasis in original), including claims under the Rehabilitation Act and Section 1983. See, e.g. Id. at 248-49 (holding that Section 1983 claims fall "within the scope of Section 1415(*l*) to the same extent as * * * claims under the ADA or the Rehabilitation Act."); J.S., 386 F.3d at 112 ("As the district court correctly noted, the students asserted a section 504 Rehabilitation Act claim and a section 1983 claim that both seek to ensure a free appropriate public education, thus subjecting both to the IDEA exhaustion requirement.")

Plaintiff seeks damages and injunctive relief, together with costs and attorney's fees, in

this action. Although injunctive relief, costs and attorney's fees are available under the IDEA, see Polera, 288 F.3d at 486 (holding that declaratory and injunctive relief, reimbursement of educational expenses and attorneys' fees are all available under the IDEA); 20 U.S.C. § 1415(i)(3)(B)(i) ("In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs– (I) to a prevailing party who is the parent of a child with a disability * * *"), compensatory and punitive damages are not. See Cave, 514 F.3d at 247; Baldessarre, 496 F. App'x at 133; Polera, 288 F.3d at 486 ("The purpose of the IDEA is to provide educational services, not compensation for personal injury, and a damages remedy– as contrasted with reimbursement of expenses–is fundamentally inconsistent with this goal.")

Although "damages [are] an available remedy in actions brought pursuant to 42 U.S.C. § 1983 for violations of the IDEA," Polera, 288 F.3d at 483, "a disabled student who claims deficiencies in her educational program may not bypass the IDEA's administrative exhaustion rule merely by claiming monetary damages." Cave, 514 F.3d at 247; see also Taylor, 313 F.3d at 789-90 ("A plaintiff cannot evade the IDEA's exhaustion requirement simply by framing his or her action as one for monetary relief."); Polera, 288 F.3d at 487 (holding that plaintiffs are "not permitted to evade the IDEA's exhaustion requirement merely by tacking on a request for money damages.") "[T]he theory behind the grievance may activate the IDEA process, even if the plaintiff wants a form of relief that the IDEA does not supply." Baldessarre, 496 F. App'x at 133 (quoting Cave, 514 F.3d at 246) (emphasis omitted).

Plaintiff is essentially alleging that defendants denied K.C.G. a free appropriate public education, i.e, an IEP and appropriate educational and related services, during the 2012-2013

22

academic year, (see Compl., ¶¶ 135-136, 157-158), which is within the ambit of the IDEA, see, e.g. Polera, 288 F.3d at 488 ("The IDEA is intended to remedy precisely the sort of claim made by [the plaintiff]: that a school district failed to provide her with appropriate educational services"), and "best dealt with through the [IDEA's] administrative process." Cave, 514 F.3d at 247-48. Accordingly, all of plaintiff's claims are subject to the IDEA's exhaustion requirement. "The fact that [plaintiff] seeks damages, in addition to relief that is available under the IDEA, does not enable her to sidestep the exhaustion requirements of the IDEA." Polera, 288 F.3d at 488.

### 3. The Futility Exception

"The exhaustion requirement is excused when exhaustion would be futile because the administrative procedures do not provide an adequate remedy." Cave, 514 F.3d at 249; see also Polera, 288 F.3d at 488 (accord). "To show futility, a plaintiff must demonstrate that 'adequate remedies are not reasonably available' or that 'the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process." Coleman, 503 F.3d at 205 (quoting J.G. v. Bd. of Educ. Of Rochester City Sch. Dist., 830 F.2d 444, 447 (2d Cir. 1987)); see also Cave, 514 F.3d at 249 ("[T]he exhaustion requirement does not apply 'when pursuit of the administrative remedies would be futile because the agency either was acting in violation of the law or was unable to remedy the alleged injury.'" (quoting Heldman ex rel. T.H. v. Sobol, 962 F.2d 148, 159 (2d Cir. 1992))). The Second Circuit has "accepted arguments of futility where parents were not informed of administrative remedies, * * * where the state agency was itself acting contrary to law, * * * where the case involves systemic violations that could not be

23

remedied by local or state administrative agencies, * * * or where an emergency situation exists (e.g., the failure to take immediate action will adversely affect a child's mental or physical health) * * *." Baldessarre, 496 F. App'x at 134 (quotations and citations omitted).

In addition, "if plaintiffs can demonstrate that there is no relief available to them through the administrative process, they may avail themselves of the futility * * * exception[] to the exhaustion requirement * * *." Taylor, 313 F.3d at 790. "Relief available means relief for the events, condition, or consequences of which the person complains, even if not necessarily relief of the kind the person prefers." Id. (quotations, brackets and citation omitted). "For relief to be adequate, it must 'give realistic protection to the claimed right.'" Coleman, 503 F.3d at 205 (quoting Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 199 (2d Cir. 2002)).

"The party seeking to avoid exhaustion bears the burden of showing futility." Cave, 514 F.3d at 249; see also Coleman, 503 F.3d at 205 ("The burden of demonstrating futility rests with the party seeking to avoid the exhaustion requirement.") As courts analyze whether a plaintiff has sustained the burden of showing futility, they "are to consider whether administrative review would further the goals of developing facts, making use of available expertise, and promoting efficiency." J.S., 386 F.3d at 113.

In the complaint, plaintiff alleges, *inter alia*, that defendants "knowingly refused" to provide K.C.G. with an IEP "or any similarly designed written statement," thereby depriving him and plaintiff "of any meaningful objection(s) to an IEP, the implementation thereof or the periodic review of same;" denying them "due process in the form of challenging an IEP by requesting an Impartial Hearing Officer;" and making their "pursuit of any administrative remedies impossible." (Compl., ¶¶ 119-121, 123-24, 136). In addition, plaintiff alleges: (1) that

24

defendants "flatly ignored" her letters "demanding appropriate action and * * * information regarding procedural remedies[,]" (Compl., ¶¶ 127-28; see also ¶¶ 107-08); and (2) that "exhaustion of any administrative remedies would be futile" because defendants' violations of the IDEA "were continual and systematic [sic]," (Compl., ¶ 135).

a.     Systemic Violations

The Second Circuit has "excused exhaustion in cases involving systemic violations that could not be remedied by local or state administrative agencies 'because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process.'" Cave, 514 F.3d at 249 (quoting J.S., 386 F.3d at 114); see also Levine, 353 F. App'x at 465.

Although plaintiff seeks to prosecute this action as a class action on behalf of other students similarly situated to K.C.G., she never sought class certification and the complaint challenges only defendants' purported denial of her requests for a psychiatric evaluation and other appropriate educational and related services for K.C.G. during the 2012-2013 academic year. There are no factual allegations in the complaint from which it may reasonably be inferred that there is "a system-wide violation of the IDEA's mandates or of a district-wide policy of discrimination against [similarly disabled] students [as K.C.G.]," Cave, 514 F.3d at 250, in the School District, nor "that the administrative process is so structurally tainted that [plaintiff] would not have been afforded a fair and impartial forum to present [her] claims." Id. Since plaintiff is challenging defendants' treatment of K.C.G. individually, and "does not make

allegations other than in conclusory fashion that [K.C.G.'s] situation resulted from systemic violations of the IDEA," Levine, 353 F. App'x at 465, it would not have been futile for plaintiff to exhaust administrative remedies on this basis.

b.    Availability of Relief

In Weixel v. Bd. of Educ. Of City of New York, 287 F.3d 138 (2d Cir. 2002), the Second Circuit held that "[e]xhaustion [under the IDEA] will be excused where * * * the parents have not been notified that [administrative] remedies were available to them[] * * * because the failure of the defendants to notify [them] of their procedural rights under the IDEA 'deprived [them] of the opportunity to take advantage of the procedural safeguards offered by the statute.'" Id. at 149 (fourth brackets in original) (quoting Quackenbush v. Johnson City Sch. Dist., 716 F.2d 141, 147 (2d Cir. 1983)).

Based upon the allegations in the complaint, which are accepted as true for purposes of this motion, administrative remedies were not available to plaintiff because defendants did not inform her about the procedural safeguards of the IDEA at any time during the 2012-2013 academic year, in violation of Section 1415 of the IDEA. Defendants' failure to, themselves, comply with the requirements of the IDEA, e.g., by developing an IEP and informing plaintiff of the procedural safeguards of the IDEA, including the right to submit a due process complaint and seek a due process hearing, deprived plaintiff of her opportunity to pursue her administrative remedies under the IDEA in a timely fashion and, thus, deprived her of her "right to seek review of any decisions [she] [thought] inappropriate." Cave, 514 F.3d at 245. This is not a case of a plaintiff "bypass[ing] the IDEA's administrative exhaustion rule." Cave, 514 F.3d at 247.

Rather, if the allegations of the complaint are proven, plaintiff was deprived of her administrative remedies by defendants' purported violations of the IDEA.

Moreover, relief is no longer available to plaintiff or K.C.G. under the IDEA insofar as defendants can no longer provide plaintiff with the educational and related services he required during the 2012-2013 academic year. As such, the only remedies available to plaintiff and K.C.G. for defendants' purported violations of the IDEA during the 2012-2013 academic year are damages and costs pursuant to 42 U.S.C. §§ 1983 and 1988. Moreover, the purpose and goals of the exhaustion rule are not served by requiring plaintiff to now exhaust her administrative remedies under the IDEA because, *inter alia*, plaintiff and K.C.G. have already been deprived of a prompt resolution of their grievances by defendants' violations of the IDEA and, although exhaustion might fulfill the goal of developing the facts, it would no longer further the goals of making use of administrator's expertise or promoting efficiency. Since the complaint plausibly alleges that administrative remedies were not available to plaintiff, plaintiff has satisfied her burden of demonstrating at the pleadings stage that exhaustion of administrative remedies under the IDEA would be futile. Accordingly, the branch of defendants' motion seeking dismissal of the complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is denied.

B.    Rule 12(b)(6)

1.    Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167

27

L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S. Ct. 1937.

The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678, 129 S. Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013); Rothstein v. UBS AG, 708 F.3d 82, 90 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual

allegations." Id. at 679, 129 S. Ct. 1937. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.; see also Ruston v. Town Board for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120-1 (2d Cir. 2010); see also Matson v. Board of Education of City School District of New York, 631 F.3d 57, 63 (2d Cir. 2011) ("While a complaint need not contain detailed factual allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me accusation." (internal quotations and citation omitted)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679, 129 S. Ct. 1937.

The Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013).


1.    Educational Malpractice Claim

Defendants contend that "the complaint must be dismissed as an impermissible attempt to avoid the rule that there is no claim in New York for 'educational malpractice.'" (Def. Mem. at

29

8). Plaintiff contends that the complaint clearly states causes of action under federal law, i.e., the IDEA, the Rehabilitation Act and Section 1983, not for negligence.

Since the complaint does not allege educational malpractice or negligence of any kind, and plaintiff is not attacking the professional judgment of defendants, but rather their violations of specific federal laws, this branch of defendants' motion is denied. See, e.g. M.H., 2014 WL 901578, * 8 (denying branch of the defendants' motion seeking dismissal of the complaint alleging, *inter alia*, violations of the IDEA on the basis that the plaintiffs' claims sounded in educational malpractice because the plaintiffs did not allege educational malpractice or negligence of any kind and "it is not for the * * * Defendants to characterize plaintiffs' claims at the motion to dismiss stage when the court is required to determine only whether plaintiffs' allegations plausibly give rise to an entitlement to relief." (quotations and citation omitted)); cf. Hoffman v. Bd. of Educ. of City of New York, 49 N.Y.2d 121, 125, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979).

### 2.     Availability of Damages

#### a.     Section 1983 Claim

Defendants contend that plaintiff "has not provided sufficient facts to establish that she was denied access to either IDEA's complaint resolution procedure as implemented by New York State or the administrative remedies of an impartial hearing and an appeal to the Office of State Review[,] [and] [t]hus, her allegations of damages claims under Section 1983 for mere violations of IDEA are indistinguishable from claims of educational malpractice and are foreclosed from relief in the instant proceeding." (Def. Mem. at 11-12). Plaintiff contends that

since the complaint alleges that she and K.C.G. were denied procedural safeguards guaranteed by the IDEA, she may seek damages under Section 1983.

"Defendants' deliberate interference with procedural safeguards guaranteed by Congress for the purpose of depriving [a disabled student] of special educational services necessary to provide him with free appropriate public education would constitute the deprivation of a right guaranteed under federal law within the meaning of Section 1983." Quackenbush, 716 F.2d at 148. Accordingly, Section 1983 "suppl[ies] the right of action to a plaintiff who has been denied procedural safeguards under Section 1415 [of the Education of the Handicapped Act, the predecessor of the IDEA] and who, as a result thereof, has not received the findings and decision following the impartial due process administrative hearing contemplated by Section 1415." Id. "Although monetary damages are not available under the IDEA itself, a plaintiff may recover monetary damages for a violation of the IDEA pursuant to Section 1983." Taylor, 313 F.3d at 786 n. 14 (citing Polera, 288 F.3d at 483, n. 5); see also Smith v. Guilford Bd. of Educ., 226 F. App'x 58, 63 (2d Cir. June 14, 2007) (summary order) ("It is well-settled that, while the IDEA itself does not provide for monetary damages, plaintiffs may sue pursuant to Section 1983 to enforce its provisions– including the right to a [free appropriate public education]– and to obtain damages for violations of such provisions.")

Contrary to defendants' contention, the complaint sufficiently alleges, as set forth above, that plaintiff was denied the procedural safeguards and administrative remedies to which she was entitled under the IDEA by defendants' conduct. Accordingly, plaintiff may assert a Section 1983 claim for damages based upon the purported violations of the IDEA by defendants. Cf. Streck v. Bd. of Educ. of East Greenbush Sch. Dist., 280 F. App'x 66, 68 (2d Cir. May 30, 2008)

31

(summary order) (holding that since the plaintiffs failed to allege a denial of procedural safeguards or administrative remedies, they could not rely on Section 1983 to pursue damages for violations of the IDEA); French v. New York State Dep't of Educ., No. 5:04-cv-434, 2010 WL 3909163, * 11 (N.D.N.Y. Sept. 30, 2010), aff'd, 476 F. App'x 468 (2d Cir. Nov. 3, 2011) (accord); Rekowicz ex rel. Congemi v. Sachem Cent. Sch. Dist., No. 11-cv-1561, 2012 WL 4172487, at * 1 (E.D.N.Y. Sept. 17, 2012) ("[P]laintiffs cannot use Section 1983 to obtain damages for IDEA violations absent allegations that they were denied IDEA's procedural safeguards and administrative remedies * * *." (quotations and citation omitted)). Accordingly, the branch of defendants' motion seeking dismissal of plaintiff's Section 1983 claim for damages is denied.

b.     Rehabilitation Act Claim

Defendants contend that the complaint fails to state a claim under the Rehabilitation Act because plaintiff "has failed to plead and provide sufficient facts establishing that K.C.G.'s education was adversely affected by bad faith or gross misjudgment." (Def. Mem. at 12). Plaintiff contends, *inter alia*, that the complaint "is replete with allegations of reckless violations of Federal educational law, and the severely adverse effect on [K.C.G.'s] education as a result," (Plf. Mem. at 14), and, thus, states a cause of action under Section 504 of the Rehabilitation Act.

Section 504 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States * * * shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance * * *." 29

U.S.C. § 794(a). "[A] Section 504 claim may be predicated on the claim that a disabled student was denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive." C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 831 (2d Cir. 2014); see also Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist., 368 F. Supp. 2d 313, 333-34 (S.D.N.Y. 2005) ("[D]enial of access to an appropriate educational program on the basis of a disability is a Section 504 issue * * *.") "To recover under the Rehabilitation Act, there must be evidence that: (1) the student is disabled; (2) the student is otherwise qualified to participate in school activities; (3) the school or the board received federal financial assistance; and (4) the student was excluded from participation in programs at, denied the benefits of, or subject to discrimination at, the school on the basis of her disability." D.C. ex rel. E.B. v. New York City Department of Education, 950 F. Supp. 2d 494, 518 (S.D.N.Y. 2013) (quotations, brackets and citations omitted); see also P.C. v. Oceanside Union Free Sch. Dist., 818 F. Supp. 2d 526, 533 (E.D.N.Y. 2011) ("To recover under the Rehabilitation Act, Plaintiffs must demonstrate that K.C.: (1) is a disabled person under the Act; (2) has been excluded from benefits of a federally funded program or special service; (3) because of his disability." (emphasis omitted)). Only the fourth element, i.e., intentional discrimination, is at issue here.

"To demonstrate discrimination under Section 504, the plaintiff is not required to show personal animosity or ill will * * *." D.C. ex rel. E.B., 950 F. Supp. 2d at 518 (quotations, brackets and citation omitted); see also Gabel, 368 F. Supp. 2d at 334 (accord); Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist., No. 07 Civ. 8828, 2013 WL 3929630, at * 11 (S.D.N.Y. July 30, 2013), appeal dismissed, No. 13-3400 (2d Cir. Dec. 10, 2013) ("[S]ince intentional discrimination can be inferred when a school district acts with gross negligence or reckless

33

indifference in depriving a student of access to a [free appropriate public education], a plaintiff is not required to show personal animosity or ill will." (quotations and citation omitted)). "Discrimination may be inferred when there is evidence that a school district acted with deliberate or reckless indifference to the student's federally protected rights or with bad faith or gross misjudgment." D.C. ex rel. E.B., 950 F. Supp. 2d at 518; see also C.L., 744 F.3d at 841 (holding that a Section 504 claim "requires proof of bad faith or gross misjudgment."); S.W. by J.W. v. Warren, 528 F. Supp. 2d 282, 290 (S.D.N.Y. 2007) ("[P]laintiffs can rely on Section 504 to claim that they are denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive, if they can show that defendants acted with bad faith or gross misjudgment in the administration of disability services."); Gabel, 368 F. Supp. 2d at 334 ("[I]ntentional discrimination may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a [free appropriate public education]."); R.B. ex rel. L.B. v. Bd. of Educ. of City of New York, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000) ("In the special education context, courts have held that a plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP to establish liability [under Section 504]; a plaintiff must show that defendants acted with bad faith or gross misjudgment.") A violation of the IDEA, without more, is insufficient to support a claim of disability-based discrimination under Section 504 of the Rehabilitation Act, French, 476 F. App'x at 472-73; see also Kalliope R. v. New York State Department of Education, 827 F. Supp. 2d 130, 143 (E.D.N.Y. 2010) ("Since Section 504 relief is conditioned on a showing of discrimination, it requires something more than proof of a mere violation of IDEA–i.e., more than a faulty IEP"), and a "fail[ure] to show that the alleged 'discrimination' is anything more

34

than a rehashing of [the plaintiff's] allegation that the defendants failed to provide her with a [free appropriate public education]," French, 476 F. App'x at 473, warrants dismissal of a Rehabilitation Act claim. See id.; P.C., 818 F. Supp. 2d at 833 (granting summary judgment dismissing the plaintiffs' Rehabilitation Act claims because those claims were "merely restatements of their IDEA claims– that Defendant failed to appropriately classify the plaintiff."); Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist., 473 F. Supp. 2d 477, 484 (S.D.N.Y. 2007) (accord).

Intentional discrimination may be inferred "when a defendant takes action to provide a disabled student with fewer services than had previously been deemed necessary[,]" Kalliope R., 827 F. Supp. 2d at 143; "[i]f plaintiffs can show that defendants had no proper or reasonable basis for [implementing a] policy limiting available services [for disabled students], knowing it would result in a failure to adequately implement IEPs established to provide disabled students with an equal opportunity to a free and adequate education * * *[,]" S.W. by J.W., 528 F. Supp. 2d at 291; "when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom[,]" Id. (quotations, brackets and citation omitted); or when the school district commits numerous errors in handling a disabled student's case, see, e.g. Gabel, 368 F. Supp. 2d at 335 ("Case law from this Circuit suggests that the District's many failures [in handling the disabled student's case] may rise to the level of gross negligence or reckless indifference sufficient to support a claim of discrimination under Section 504.")

Plaintiff, in essence, is alleging that K.C.G. was denied access to a free appropriate educational program by defendants' conduct. Plaintiff's allegations, *inter alia*, that defendants

35

failed to meet with her or K.C.G. prior to the start of the 2012-2013 academic year; failed to

develop an IEP for K.C.G., to arrange a timely psychiatric evaluation of K.C.G. and to provide

him with appropriate educational and related services during the 2012-2013 academic year; and

placed K.C.G. in an inappropriate and insufficient program, i.e., home instruction, whereby he

was excluded from the school for almost his entire Junior year and prevented from obtaining a

sufficient number of credits to enable him to graduate on time, because of his disability rise to

the level of gross negligence or deliberate indifference to the likelihood that K.C.G.'s rights were

being violated sufficient to withstand dismissal of the Rehabilitation Act claim at the pleadings

stage. See, e.g. Butler v. S. Glens Falls Cent. Sch. Dist., 106 F. Supp. 2d 414, 420 (N.D.N.Y.

2000) (denying summary judgment to defendants because the plaintiff presented evidence, *inter*

*alia*, that the defendants failed to develop IEP's for him and to provide him with certain special

education services, which conduct, "if proven, may constitute deliberate indifference to the

strong likelihood that plaintiff's rights were being violated.") Accordingly, the branch of

defendants' motion seeking dismissal of plaintiff's Rehabilitation Act claim for damages is

denied.


c.      Qualified Immunity

Defendants contend that the individual defendants are entitled to qualified immunity from

plaintiff's claims for damages because the complaint "simply reiterates [plaintiff's] continuous

disagreement with the District's educational programming for K.C.G. for the 2012-2013 school

year[], * * * [which] does not establish that [they] violated a statute prohibiting discrimination."

(Def. Mem. at 14). Plaintiff contends, *inter alia*, that defendants do not "adequately plead[] a

qualified immunity affirmative defense" because they do not "claim which, if any of the individually named defendants * * * are entitled to qualified immunity[;] * * * [or] assert that any one of the individually named defendants' actions were not violative of clearly established law or that it was objectively reasonable for any of the individually named defendants to take the actions alleged in Plaintiffs' Complaint." (Plf. Mem. at 15-16).

"Qualified immunity protects federal and state officials from both civil damages and 'unnecessary and burdensome discovery or trial proceedings[,]'" Spavone v. New York State Department of Correctional Services, 719 F.3d 127, 134 (2d Cir. 2013) (quoting Crawford-El v. Britton, 523 U.S. 574, 598, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)); see also Coollick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012) (accord), "where the officials' conduct was not in violation of a 'clearly established' constitutional [or statutory] right." Sudler v. City of New York, 689 F.3d 159, 174 (2d Cir. 2012), cert. denied, 133 S. Ct. 2777, 186 L. Ed. 2d 219 (2013); see also Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) ("A federal official is entitled to qualified immunity from suit for money damages unless the plaintiff shows that the official violated a statutory or constitutional right, and that the right was 'clearly established' at the time of the challenged conduct.") "It is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." Spavone, 719 F.3d at 134 (quotations and citation omitted); see also Sudler, 689 F.3d at 174 ("Qualified immunity is an affirmative defense, on which the defendant officials bear the burden of proof.") "Qualified immunity * * * extends to circumstances where an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' and applies 'regardless of whether the government official's error is a mistake of law, a

37

mistake of fact, or a mistake based on mixed questions of law and fact.'" Spavone, 719 F.3d at

135 (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009));

see also Vincent v. Yelich, 718 F.3d 157, 166 (2d Cir. 2013) ("Qualified immunity, an

affirmative defense on which the defendant officials bear the burden of proof, * * * protects

public officials performing discretionary functions from personal liability in a civil suit for

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."); Taylor, 313 F.3d at 793 ("Individual

public officials are entitled to qualified immunity from claims for monetary damages if the

statutory right infringed was not clearly established at the time of the violation or if it was

objectively reasonable for officials to believe their acts did not infringe upon those rights.") "So

long as a defendant has an objectively reasonable belief that his actions are lawful, he is entitled

to qualified immunity." Spavone, 719 F.3d at 135 (quotations and citation omitted); see also

Sudler, 689 F.3d at 174 ("If the conduct did not violate a clearly established right, or if it was

objectively reasonable for the official to believe that his conduct did not violate such a right, then

the official is protected by qualified immunity." (quotations, brackets and citation omitted)).

"Qualified immunity 'provides ample protection to all but the plainly incompetent or those who

knowingly violate the law.'" Vincent, 718 F.3d at 166 (emphasis omitted) (quoting Malley v.

Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); see also Sudler, 689 F.3d

at 174 ("Qualified immunity * * * shields government officials from liability when they make

reasonable mistakes about the legality of their actions * * *." (quotations and citation omitted)).

"Because the immunity not only protects against a judgment for damages but also is in

part an entitlement not to be forced to litigate, * * * early resolution of the qualified immunity

defense is encouraged * * *." Vincent, 718 F.3d at 166-67 (quotations and citations omitted);

see also Walker, 717 F.3d at 126 ("[C]ourts should resolve the question of qualified immunity at

the 'earliest possible stage in litigation[.]" (quotations and citation omitted)). However, "a

defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for

summary judgment must accept the more stringent standard applicable to this procedural

route[.]" Walker, 717 F.3d at 126 (quoting McKenna v. Wright, 386 F.3d 432, 436 (2d Cir.

2004)). "[O]n a motion to dismiss, 'it is the defendant's conduct as alleged in the complaint that

is scrutinized for objective legal reasonableness.'" McGarry v. Pallito, 687 F.3d 505, 514 (2d Cir.

2012) (quoting Behrens v. Pelletier, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773

(1996)). Accordingly, "qualified immunity is often best decided on a motion for summary

judgment when the details of the alleged deprivations are more fully developed." Walker, 717

F.3d at 130.

"Where the nonexistence of a constitutional [or statutory] right may be discerned from the

face of the complaint, an official defendant sued in his individual capacity may be granted a

dismissal on the ground of qualified immunity pursuant to Rule 12(b)(6) * * *." Vincent, 718

F.3d at 167; see also Bush v. City of Utica, N.Y., 558 F. App'x 131, 133 (2d Cir. Mar. 17, 2014)

(summary order) (accord). However, "a ruling on the availability of a qualified immunity

defense would be premature [on a motion to dismiss] [if,] [f]or example, the objective

reasonableness of the defendants' acts depends in part on what information they had at the time."

Taylor, 313 F.3d at 793-94.

Since, liberally read, plaintiff's complaint plausibly alleges violations of her and K.C.G.'s

rights under the IDEA and Rehabilitation Act by defendants, and that defendants acted with at

least gross negligence or deliberate indifference with respect to those rights, as set forth above, the issue with respect to qualified immunity in this case is whether defendants reasonably believed that their conduct did not violate those rights. Where, as here, "[i]t is unclear what information the individual defendants possessed when they allegedly deprived plaintiff of her rights under the IDEA and Rehabilitation Act, or whether other facts may come to light that would render their actions objectively reasonable[,]" id. at 794, a qualified immunity defense is properly denied at the pleadings stage. See id.; Starkey ex rel. Starkey v. Somers Cent. Sch. Dist., 319 F. Supp. 2d 410, 421 (S.D.N.Y. 2004) ("[T]he qualified immunity issue turns on factual questions that cannot be resolved at the motion to dismiss stage of proceedings." (quotations, brackets and citation omitted)). Accordingly, the branch of defendants' motion seeking dismissal of plaintiffs' claims for damages against the individual defendants as barred by the doctrine of qualified immunity is denied.


III.    Conclusion

For the reasons stated herein, defendants' motion seeking dismissal of plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure is denied in its entirety.

SO ORDERED.

s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN
United States District Judge

Dated: August 1, 2014
       Central Islip, N.Y.

40